**John Joseph BLAKE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 23945.

United States Court of Appeals Fifth Circuit.

Feb. 12, 1969.

---

Gaines C. Granade, Atlanta, Ga., for appellant.

William H. Hamilton, Jr., Joseph W. Hatchett, Asst. U. S. Attys., Jacksonville, Fla., Jerome M. Feit, Theodore George Gilinsky, Attys., Crim. Div., Dept. of Justice, Washington, D. C., for appellee.

Before JOHN R. BROWN, Chief Judge, WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, and MORGAN, Circuit Judges, En Banc.

BELL, Circuit Judge:

The significant assignments of error presented on this appeal center on the defense of insanity and the legal standards which are applicable thereto in a criminal trial in the federal courts. Because of the importance of the questions in light of developing medico-legal concepts in the field of behavioral science, this court, sua sponte, ordered en banc consideration of the case. We reverse for retrial on a definition of insanity more nearly attuned to present day concepts of psychiatry.

Blake was charged with bank robbery, 18 U.S.C.A. § 2113. He was arrested on the day following the robbery and his trial began some six months later. The evidence that he committed the robbery was overwhelming; his principal defense was insanity at the time of the commission of the offense. He was convicted and his motion for new trial denied. He was thereafter sentenced and this appeal followed.

## I.

There are several assignments of error which have nothing to do with the insanity defense. Decision on these, with the exception of one, will be pretermitted in view of our reversal for new trial on one of the questions arising out of the insanity defense and the fact that the claimed errors are not likely to recur on subsequent trial.

█ The one non-insanity defense assignment of error to be considered is that Blake was denied due process of law because of the conditions of his pretrial incarceration. This assignment, too, is related to his mental condition but not to the insanity defense. He was unable to make bond and claims that he suffered physical discomforts to the extent that he was unable to assist his counsel in preparing a defense. This question was considered by the district court prior to the commencement of the trial. It appeared that counsel had complete access to Blake at all times. But, it was urged, this was of no avail since Blake's mental processes were diminished by the baneful conditions of his confinement. The facts were that Blake was examined by psychiatrists, pursuant to 18 U.S.C.A. § 4244, following his indictment and again shortly before trial and they were of the opinion that he was competent, able to understand the proceedings against him, and able to assist in his own defense. The court twice found that appellant was able to understand the proceedings against him and to cooperate in his own defense. These findings were supported in fact and law. Dusky v. United States, 1960, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824. Merrill v. United States, 5 Cir., 1964, 338 F.2d 763. The court in *Dusky* stated the test as "* * * whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." 362 U.S. at p. 402, 80 S.Ct. at p. 789.

█ There is no direct attack on Blake's competency to stand trial; rather we perceive that he seeks the same end. The indirect approach also fails. This assignment of error is without merit.

## II.

The remaining assignments of error are three in number. One, appellant urges that the evidence created a reasonable doubt as to his sanity at the time of the commission of the offense and that the court thus erred in having failed to grant a judgment of aquittal. Two, it is alleged that the instructions to the jury as to the burden of proof on the issue of insanity were confusing and erroneous. Three, it is also asserted that the definition of insanity given the jury in charge for determining the issue of not guilty by reason of insanity was outmoded and prejudicial.

The contention that the evidence created a reasonable doubt requires a statement of the law as to the proof required on the issue of insanity and this discussion answers as well the assignment of error based on the charge on burden of proof. In Davis v. United States, 1895, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499, the court said:

"Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial and applies to every element necessary to constitute the crime. Giving to the prosecution, where the defence is insanity, the benefit in the way of proof of the presumption in favor of sanity, the vital question, from the time a plea of not guilty is entered until the return of the verdict, is whether, upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt. If the whole evidence, including that supplied by the pre-

sumption of sanity, does not exclude beyond reasonable doubt the hypothesis of insanity, of which some proof is adduced, the accused is entitled to an acquittal of the specific offence charged." 160 U.S. at pp. 487–88, 16 S.Ct. at p. 358.

■■ It follows that if there is some evidence supporting the claim of insanity, a conceded fact here, the issue must be submitted to the jury. Brock v. United States, 5 Cir., 1967, 387 F.2d 254, 257; Mims v. United States, 5 Cir., 1967, 375 F.2d 135, 140. This means only slight evidence. Lee v. United States, 5 Cir., 1937, 91 F.2d 326–330; Howard v. United States, 5 Cir., 1956, 232 F.2d 274, 276. It is true also, as Blake states, that the question of sufficiency of the evidence necessary to make an issue for the jury on the defense of insanity as well as whether the evidence establishes as a matter of law a reasonable doubt as to a defendant's sanity is for the court. Nagell v. United States, 5 Cir., 1968, 392 F.2d 934, 937; Bishop v. United States, 5 Cir., 1968, 394 F.2d 500, 501; United States v. Westerhausen, 7 Cir., 1960, 283 F.2d 844, 852; Fitts v. United States, 10 Cir., 1960, 284 F.2d 108.

■ The instructions given the jury by the district court here on the burden of proof accorded with the teaching of *Davis,* supra, and are free of error.

We come then to the sufficiency of evidence question. The district court followed the salutary principle, applicable in cases involving the defense of insanity, of admitting all evidence, both lay and expert, in any wise relevant or pertinent, to the issue of insanity. This is in keeping with the philosophy of letting in all facts which might be helpful to the jury in making the final determination of the criminal responsibility of the accused. See Mims v. United States, supra, 375 F.2d, at p. 143, where the

court pointed to the sound rule that the issue of insanity should be determined by the jury from all of the evidence rather than from the opinion of experts alone.[1]

This approach resulted in a wealth of raw material for the jury. In summary, the evidence respecting Blake's mental condition disclosed a well-to-do background, two years of college, and active duty with the Navy. In 1944, at the age of 21, and while in the Navy, he suffered an epileptic seizure and was thereafter given a medical discharge. He suffered disciplinary problems while in the Navy. He received electro-shock treatment in 1945, and following further mental difficulties in 1945 and 1946, entered a Veterans Administration hospital for a stay of two to three months in 1946. He taught school and coached for a time in 1946. He married in 1947 and three children were born in the ensuing years of that marriage. He was employed by his father in the construction business. Meanwhile, he became a heavy drinker.

In 1948 he was admitted to a private psychiatric institution in Connecticut where he remained for some two months and then returned to Miami to again work for his father. He thereafter received private outpatient care from psychiatrists, and between 1948 and 1954 spent time in at least three private psychiatric institutions and received further electro-shock treatment.

By 1954 he had left his father's business. From 1955 to 1960, his behavior was characterized by heavy drinking and irrational acts. He began the use of stimulants and drugs. In 1955 he received eight electro-shock treatments. He was adjudged incompetent in 1956 and placed under his father's guardianship to be placed in a private institution in lieu of commitment. He was discharged from the private institution

---

1. The court did not denigrate the experts or their conclusions; rather the court noted the value of their testimony in explaining " * * * the disease and its dynamics, that is, how it occurred, de-veloped, and affected the mental and emotional processes of the defendant," citing Carter v. United States, 102 U.S. App.D.C., 227, 1957, 252 F.2d 608 at p. 617.

some six months later. He followed his psychiatrist to Indiana and was treated on an outpatient basis for about a year.

He was divorced from his first wife in 1958 and married again shortly afterwards. He was arrested in December 1959 for shooting his second wife. After spending a few days in jail, he was placed in a state mental hospital for several months and was finally placed on probation for the shooting offense. He continued to receive private psychiatric treatment, in and out of hospitals while on probation up to the spring of 1963. In fact, he spent six months in 1962 in a Florida state mental hospital after being declared incompetent and certified for treatment.

Having received a probated sentence in the shooting incident, and still being on probation, Blake in 1963 was sentenced to the Florida state penitentiary after being called up for violation of probation on a charge of aggravated assault. He was released from prison on September 14, 1965. While in prison he was hospitalized three or four times; saw the prison psychiatrist, and complained of blackouts. During this period of confinement he was divorced by his third wife. He married his fourth wife on December 2, 1965. The robbery in question occurred on December 6, 1965. To this point Blake's adult life had been one long round of confinement for mental problems and drinking when not confined.

The facts of the robbery are rather bizarre. Blake committed the robbery within a matter of two or three hours after making an attempt to obtain a legal hearing before the United States District Court for the Middle District of Florida in Jacksonville. Although not clear in the record, he was apparently seeking a writ of habeas corpus to relieve him of certain state prison release restrictions which kept him from going to the Miami area. He was registered at a Jacksonville hotel. He obtained a hotel employee as a chauffeur for the purpose of driving him about town. He stopped by a bar en route to the robbery, had several drinks and told a waitress that he would be back later with a large sum of money. The waitress jokingly asked him if he planned to rob a bank. He said, "That's possible."

The bank which was robbed was one of two under consideration. Each was a member of the bank group which he claimed had mishandled a trust which was established either by or for him several years earlier. His quarrel with the bank over the trust had gone on for some years and was bitter. He did not case the bank. He selected the bank, ordered his driver to take him to the bank and wait, walked in during rush hour, demanded the money, obtained it, and walked out. He had no trouble getting away immediately to Tampa in the same car and with the same driver. He returned from Tampa to Jacksonville the very next day with an attorney to press his petition for the writ in the district court and was arrested for the robbery.

There was psychiatric testimony that Blake was suffering from the mental disease of schizophrenia, marked with psychotic episodes, and that his behavior on the occasion of the robbery indicated that appellant was in a psychotic episode. This was described as a form of severe mental illness. There was testimony that in such a period his actions would not be subject to his will. On the other hand, there was psychiatric testimony that he had a sociopathic personality and was not suffering from a mental disease.

■■ As stated, the burden was on the prosecution, once the hypothesis of insanity was established, to prove beyond a reasonable doubt that Blake was sane at the time of the commission of the crime, and was thus possessed of the requisite criminal intent. The question posed is whether the evidence adduced was sufficient to make a jury question. We hold that it was. Reasonable men would not necessarily possess a reasonable doubt as to his sanity at the time of the robbery when considered in the context of the facts. It can hardly be

doubted that he was less than normal mentally, whether his problem be termed a disease or disorder or a sociopathic personality. In any event, under these facts, one issue for the jury was whether Blake had a mental disease or defect; if so, another was whether it met the legal test of insanity. Still another was the relationship of such mental defect to the crime, a question of causation. Cf. Mims v. United States, supra, 375 F.2d, at p. 142; Birdsell v. United States, 5 Cir., 1965, 346 F.2d 775, 781. We reiterate that the government had the burden of establishing the requisite mental capacity beyond a reasonable doubt; conversely, Blake was not entitled to a directed verdict of acquittal.

### III.

We come then to the definition of insanity given in charge. The district court charge was based on the dictum in Davis v. United States, on the second appearance of the case in the Supreme Court, 165 U.S. 373, 378, 17 S.Ct. 360, 41 L.Ed. 750 (1897). This is the standard which this circuit has followed. Howard v. United States, supra, 232 F. 2d 274, 275 (en banc), affirming 229 F. 2d 602. See also Carter v. United States, 5 Cir., 1963, 325 F.2d 697 (en banc), cert. den., 377 U.S. 946, 84 S.Ct. 1353, 12 L.Ed.2d 308; where the propriety of the Davis standard was affirmed by an equally divided court. For factual reasons we declined to revisit the issue in Birdsell v. United States, supra, 346 F.2d at p. 781, fn. 8.

We are asked once again to review the Davis definition to the end of holding that the district court committed reversible error in giving it in charge. Blake urges that such a charge is unduly restrictive and that it was prejudicial to him. The government denies that the charge was prejudicial but states that the Davis definition could be improved by converting it into more up-to-date language. This overlooks the fact that the district court here updated the language. The real issue is the government's opposition to the substitution of a standard or measure of substantiality for the complete lack of mental capacity measure of Davis. It urges that "substantial" is an imprecise and phantom-like term. The other side of the coin is that rarely if ever is one completely lacking in mental capacity. The government insists on the absolutes of Davis. The district court, following our decisions, charged the absolutes.

These positions point up the difference between the Davis standard and that of the Model Penal Code as adopted by the American Law Institute. The Davis standard is as follows:

"The term 'insanity' as used in this defence means such a perverted and deranged condition of the mental and moral faculties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of the act he is committing, or where, though conscious of it and able to distinguish between right and wrong and know that the act is wrong, yet his will, by which I mean the governing power of his mind, has been otherwise than voluntarily so completely destroyed that his actions are not subject to it, but are beyond his control." 165 U.S. at 378, 17 S.Ct. at 362.

Section 4.01 of the ALI Model Penal Code is as follows:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

The federal courts of appeals have given extensive consideration to the problem of adapting the definition of insanity as it is to be applied in administering the defense of insanity to the expanding knowledge available from medical science. One prime question has been that of a test couched in terms of substantial lack of mental capacity as distinguished from a complete lack of capacity. The dissenting opinions in our *Carter* case, supra, 325 F.2d 697, and the decisions of other circuits contain elaborate discussions of the problem of definition beginning with McNaghten's Rule, 1843, 10 Cl. and F. 200, 210, 8 Eng.Rep. 718, 722. They are filled with references to the applicable treatises, both of law and medicine.

The upshot is that the Second, Fourth, Sixth, Seventh and Tenth Circuits have adopted the substantiality test of the Model Penal Code. United States v. Freeman, 2 Cir., 1966, 357 F.2d 606; United States v. Chandler, 4 Cir., 1968, 393 F.2d 920 (en banc); United States v. Smith, 6 Cir., 1968, 404 F.2d 720 United States v. Shapiro, 7 Cir., 1967, 383 F.2d 680 (en banc); Wion v. United States, 10 Cir., 1963, 325 F.2d 420 (en banc). The District of Columbia Circuit has adopted a substantiality test although not stated in Model Penal Code terms. Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430, as modified by McDonald v. United States, 1962, 114 U.S.App.D.C. 120, 312 F.2d 847 (en banc): " * * * the jury should be told that a mental disease or defect includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." 312 F.2d at p. 851. The same is true of the Third Circuit. United States v. Currens, 3 Cir., 1961, 290 F.2d 751:

" * * * The jury must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the

law which he is alleged to have violated." 290 F.2d at 774.

The First and Ninth Circuits have open minds on the question. Amador Beltran v. United States, 1 Cir., 1962, 302 F.2d 48; Ramer v. United States, 9 Cir., 1968, 390 F.2d 564. On the other hand, the Eighth Circuit in Pope v. United States, 8 Cir., 1967, 372 F.2d 710 (en banc), reversed on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), discussed all of the current standards and concluded that the possibility of gradations in capacity would be met by the following standard:

We hold * * * that if the trial court freely admits all evidence which appears to be relevant and *if the charge appropriately embraces and requires positive conclusions by the jury as to the defendant's cognition, his volition, and his capacity to control his behavior, and if these three elements of knowledge, will and choice are emphasized in the charge as essential and critical constituents of legal sanity, we shall usually regard the charge as legally sufficient.* 372 F.2d at 736.

The facts of this case point up the difference in the standards. Here the facts are such, read favorably to the government as they must be, Glasser v. United States, 1942, 315 U.S. 60, 62 S. Ct. 457, 86 L.Ed. 680, as not to show complete mental disorientation under the absolutes of *Davis*. The record does show evidence which, if believed, would indicate that Blake suffered from a severe mental disease which the jury might have found impaired his control over the conduct in question. He could not prevail under a *Davis* charge. He might have prevailed under a substantial lack of capacity type charge.

We think that a substantiality type standard is called for in light of current knowledge regarding mental illness. A person, as Blake here, may be a schizophrenic or may merely have a sociopathic personality. The evidence could go either way. He may or may not have

been in a psychotic episode at the time of the robbery. But, he was not unconscious, incapable of distinguishing right and wrong nor was his will completely destroyed in the terms of *Davis* definition. Modifying the lack of mental capacity by the adjective "substantial", still leaves the matter for the jury under the evidence, lay and expert, to determine mental defect *vel non* and its relationship to the conduct in question. Mims v. United States, supra.

We have concluded that this is an appropriate case for adopting a definition of insanity which will serve as a vehicle to enable the court and jury to give effect to the defense of insanity in terms of what is now known about diseases of the mind. We conclude also that such a definition must be in less than the absolute terms of *Davis*. A substantial lack of capacity is a more nearly adequate standard. We treat the *Davis* test as a dictum and in no event is it a stricture on our supervisory power to adopt a new standard. On supervisory power, see La Buy v. Howes Leather Co., 1957, 352 U. S. 249, 254–260, 77 S.Ct. 309, 1 L.Ed.2d 290: Thomas v. United States, 5 Cir., 1966, 368 F.2d 941, 946–947.[2]

The question remains as to the specifics of the standard. The federal courts of appeals as well as the state courts serve as separate laboratories in the development of the law, and it is at once apparent that we are somewhat late in this field. Much can be gained from what has been developed in the other laboratories. As noted, the ALI Model Penal Code standard in varying forms

has been adopted in five of the federal circuits. Moreover, that same substantiality standard has been adopted in five states.[3]

We have carefully considered the approach taken by the Eighth Circuit in Pope v. United States, supra, of requiring a charge on the basics of cognition, volition, and capacity to control behavior, with the body of the charge to be left to the district court. There is much merit in not requiring a straitjacket charge but there is also merit in the idea of uniformity. We have concluded to adopt the Model Penal Code standard and to require it or an approximation of it as a matter of uniformity in this circuit. We think it lends itself as a uniform standard.

At the same time, we must notice that the circuits adopting the Model Penal Code standard have varied it in some degree. For example, the Sixth Circuit expressly refused to adopt the second paragraph of the Model Penal Code standard, § 401(2), Smith v. United States, supra, fn. 8, while the Second, Fourth, and Seventh Circuits did adopt the contents of the paragraph as a part of the standard. United States v. Freeman, supra; United States v. Chandler, supra; United States v. Shapiro, supra. The Tenth Circuit did not address itself to the question. Wion v. United States, supra. We have determined to follow the Second, Fourth, and Seventh Circuit opinions in this regard.

We follow the Second and Seventh Circuits, in the same opinions, in substituting the alternative term "wrongful-

2. We make this change in spite of the government's argument that there are no confinement procedures, save in the District of Columbia, for federal court use when a defendant is acquitted on the defense of insanity. To make matters worse, there is no specific defense of insanity. The Congress is aware of this fact. United States v. Freeman, supra, 357 F.2d 606, 626–627, fn. 61; Tydings, A Federal Verdict of Not Guilty by Reason of Insanity and a Subsequent Commitment Procedure, 27 Md.L.Rev. 133 (1967). The Separation of Powers doctrine requires that a court act within its

scope; indeed, it is in keeping with the doctrine that courts may assume that the Executive and Congress will do whatever they deem necessary in the interest of society, and that the views of all three branches on that interest will coincide.

3. Ill.Crim.Code, ch. 38, § 6–2 (1961); Md. Annot.Code, Art. 59, § 9(a) (1968); Vt. St.Ann. Tit. 13, § 4801 (1959); N.Y. Penal L., § 30.05 (McKinney's Consol. Laws, c. 40, 1967); Commonwealth v. McHoul, 1967, 352 Mass. 544, 226 N.E.2d 556.

ness" as used in the first paragraph of the Model Penal Code for "criminality". The Second Circuit concluded that it was a broader term in that it would include the case where the perpetrator appreciated that his conduct was criminal but, because of a delusion, believed it to be morally justified. United States v. Freeman, supra, 357 F.2d at p. 622, fn. 52.

■ In sum, we adopt the following standard as a definition for use in defining insanity in this circuit where the defense of insanity is in issue:

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

■ This leaves two questions: First, shall Blake have the benefit of the new standard? We hold that he should. More than the power to avoid rendering an advisory opinion is involved. Stovall v. Denno, 1967, 388 U.S. 293, 301, 87 S.Ct. 1967, 18 L.Ed.2d 1199. Here we think that Blake was prejudiced by the *Davis* definition of insanity given in charge to the extent of being entitled to a new trial under the new definition.

■ Second, is the new standard to apply retroactively? The Second and Sixth Circuits have concluded that the new standard would apply prospectively only except as to those cases involving the defense of insanity which were then on appeal. United States v. Tarrago, 2 Cir., 1968, 398 F.2d 621; United States v. Smith, supra. We adopt the same rule. The new definition of insanity is to apply prospectively only, i. e., from the

date of this decision, except as to those cases now on appeal.

Reversed and remanded for further proceedings not inconsistent herewith.